J-S25002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.G.K.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.A.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1207 EDA 2021 |

Appeal from the Order Entered October 29, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2020-A0118

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.A.A., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1208 EDA 2021 |

Appeal from the Order Entered October 29, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2020-A0121

BEFORE:   BENDER, P.J.E., McLAUGHLIN, J., and PELLEGRINI, J.*

MEMORANDUM BY BENDER, P.J.E.:                    Filed: October 7, 2021

P.A.A. (Mother) appeals from the orders entered on October 29, 2020, that granted the petitions filed by the Montgomery County Office of Children and Youth (OCY) to involuntarily terminate Mother's parental rights to J.G.K.B. (born in October of 2015) and J.A.B. (born in December of 2016) (collectively

_____

* Retired Senior Judge assigned to the Superior Court.

the Children), pursuant to Sections 2511(a)(1), (2), (8) and (b) of the Adoption Act, 23 Pa. C.S. §§ 2101-2938, and to change the permanency goal to adoption under the Juvenile Act, 42 Pa.C.S. § 6351.[1, 2]  Following review, we affirm.

The facts as found by the trial court are gleaned from the transcript of the termination hearing in that the trial court provided its reasoning at the end of the hearing and relies on this discussion *in lieu* of an opinion.  **See** Trial Court Order, 5/14/2021.   We reproduce the pertinent sections of that transcript, as follows:

> In this case, the evidence established that [Mother] brought the [C]hildren to [OCY] and voluntarily relinquished custody of the [C]hildren on October 18th, 2018.  At the time, she was homeless and unable to provide safe and stable housing for the [C]hildren.
>
> Since that time, the evidence has established that [Mother] has been unable to obtain and sustain safe and stable housing where she can bring the [C]hildren to live with her, and although other family resources were considered, each of them was unable

---

[1] In an order dated July 2, 2021, this Court consolidated Mother's two appeals *sua sponte* in that they involve related parties and issues.  **See** Pa.R.A.P. 513.

[2] Upon review of the certified trial court record, it was discovered that untimely notices of appeal were filed on March 12, 2021, from the October 29, 2020 orders.  After further review, it was discovered that timely notices of appeal had been filed on November 24, 2020, from the October 29, 2020 orders, but due to a breakdown in the trial court, the November 24, 2020 notices of appeal were never transmitted to this Court.  **See** Pa.R.A.P. 905(b) ("The clerk shall immediately transmit to the prothonotary of the appellate court named in the notice of appeal a copy of the notice of appeal.").  As a result of this breakdown in the trial court, the timely November 24, 2020 notices of appeal were entered by this Court's prothonotary.  Additionally, on June 24, 2021, separate orders were entered, quashing as untimely the March 12, 2021 appeals.

to provide a home for the [C]hildren, particularly beginning in 2018. For instance, the paternal grandmother, who is the permanent legal custodian for [Mother's] two older children, stated, and [Mother] confirmed, [that paternal grandmother] was unable to take custody of the two younger [C]hildren[,] already having the two older children in her home.

[OCY] worked with [Mother], based upon the testimony of both of the caseworkers and [Mother], to assist her [in] trying to find housing. She had received assistance to find housing through Your Way Home prior to 2018. I believe she stated at that time she had found housing in Pottstown, which she subsequently left in either late 2018 or early 2019 when she was working with a caseworker …, Miriam.

She received assistance through another program that was referred to as – I think it is AIHR – which provided her through OCY with a first month's rent and security deposit and helped her secure an apartment on Swede Street in Norristown, which she, after three months, decided to leave. She said she was unable to continue to afford that apartment. Apparently, the programs, Your Way Home and the other program, were unable to provide her assistance before 2018 and in 2018, [and in] 2019…. So although she sought additional assistance, OCY was unable successfully to provide her – to get her into a home that she could sustain.

With respect to ground 2511(a)(8) of the statute, the primary condition that caused the [C]hildren to come into care at that time, [Mother's] lack of a stable, safe home where she could raise the [C]hildren, continues to exist.

Additionally, that circumstance by itself, being an economic circumstance, will not be enough to sustain a petition to terminate parental rights. However, [OCY] has demonstrated by clear and convincing evidence that [Mother] has been unable to maintain regular, constant, continuous, and reliable connections with the [C]hildren. This is the most important factor to my mind based upon all of the evidence that's been introduced in the case. Many visits were offered. Initially, [Mother] had weekly visits with the [C]hildren, but beginning quite early in the case[, OCY] determined that the contacts and the visits had to be supervised at [OCY] because they were already inconsistent back … in 2018.

- 3 -

During 2019, [Mother] had some inconsistency in her visits with the [C]hildren, but particularly, beginning [in] December of 2019, [Mother] fell out of contact with both the [C]hildren and [OCY]. Her last visit in 2019 with the [C]hildren was on December 11th, 2019, at the [OCY] office in person and supervised. From that date until May 8th, 2020, no visits occurred between [Mother] and the [C]hildren.

She has candidly testified to the [c]ourt that this was a difficult time[-]period for her, that she became involved in using drugs, and she testified to the [c]ourt and had also advised … [OCY] when she did contact them again that she went to a rehab facility in Valley Forge for a period of 28 days in approximately December or January 2019 to 2020. However, she did not explain why she was unable to resume visits from the time of her discharge from rehab until May of 2020.

When she did contact [OCY] again in May of 2020, by that time the COVID-19 pandemic had significantly reduced the ability of OCY, the [courts], and other entities to foster in-person contact. So[,] for at least some period of time[,] what OCY offered in place for in-person contact was visits via Zoom. These visits resumed between [Mother] and her children and the two young [C]hildren on May 8th, 2020. And initially in the month of May and the beginning of the month of June, she attended these visits faithfully for five visits in a row. Thereafter, however, she missed three visits in a row, June 11th, June 15th and July 3rd. [On] July 10th she failed to confirm a visit. And throughout the month[s] of July and August, after the June 4th visit until September 4th, she was unable to and failed to appear for any of the visits with the [C]hildren in July and August 2020.

Similarly, [Mother] and [Father[3]] failed to appear at any of the permanency review hearings concerning the [C]hildren until the September 8th, 2020[] permanency review hearing in which [Mother] participated. So for a period of nearly two years that the [C]hildren were in placement, [Mother] did not find a way to make it a priority to attend the court hearings concerning the placement

_____

[3] The parental rights of J.B. (Father) were also involuntarily terminated by the trial court at the conclusion of the same hearing from which Mother has appealed. However, Father has not appealed and is not a party to Mother's appeal presently before this Court. *See* N.T., 10/28/2020, at 195.

of the [C]hildren, the progress of the [C]hildren, and her progress in meeting her goals to resume a parental relationship with her [C]hildren and to fulfill her parental duty to her [C]hildren.

. . . .

The testimony indicated that [Mother] has not sent cards, gifts, or otherwise tried to maintain a place of importance in the [C]hildren's lives except through the visits. Again, the visits, being so sporadic and inconsistent, have not permitted her to maintain the type of place of importance in the [C]hildren's lives that a parent must maintain.

This is a difficult case because [Mother] has testified that she's been going through a difficult time and that some of her difficulties are through no fault of her own. No doubt the COVID-19 pandemic and the economic consequences of that pandemic have compounded the problem she was already struggling with, although her struggles began before that.

My decision is based not on her economic struggles but primarily on the lack of consistency in maintaining a strong, loving, emotionally supportive relationship with the [C]hildren, including weekly or biweekly visits and making sure that she had attended all of those visits.

. . . .

With respect to the birth [M]other, … the [c]ourt finds that for a period of at least six months preceding the filing of the petition[s], the parent has refused or failed to perform parental duties with respect to each of the two [C]hildren, particularly in her failure to maintain consistent and regular contact and visits with each of the [C]hildren. This is looking backward from September 9th, 2020, back to March 2020, but even farther back to December of 2019 in her case when she lost contact with the [C]hildren for a significant period of months.

The [c]ourt also finds that – I want to make sure I mention some other findings of fact – that [Mother] has not provided a mental health evaluation to [OCY]. She has not provided proof of her sobriety to [OCY]. She has not provided proof of housing or steady income to [OCY]. While each of those is not individually enough to terminate her parental rights, taken together with her

- 5 -

inconsistency at visits and her lengthy periods of time when she was not in touch with [OCY] and its caseworkers, not providing an address, not providing contact information and not able to be reached when surgery needed to be performed on one of the [C]hildren, all of these factors together constitute a refusal and failure to perform parental duties sufficient to meet the test for termination of parental rights under Section 2511(a)(1).

Additionally, the [c]ourt finds an incapacity to parent and a refusal to parent that has left each of the [C]hildren without parental care, control, or assistance for their physical and mental well-being and the conditions and causes of these … incapacities and refusal cannot and will not be remedied by the parent.

Finally, the [c]ourt also finds with respect to the birth [M]other and with respect to each of the [C]hildren that the [C]hildren have been removed from the care of the parent by a voluntary agreement and that more than twelve months have elapsed, indeed more that twenty-four months have now elapsed from the placement of the [C]hildren and the conditions which led to the placement of the [C]hildren continue to exist and termination of parental rights will best serve the needs and welfare of the [C]hildren.

. . . .

In this case, … the testimony of the caseworkers has established that [Mother] has not maintained a healthy and secure parental bond with the [C]hildren where they look to her for support, emotional support, stability, and consistency. To the contrary, her ability to interact with the [C]hildren has been inconsistent and irregular.

By contrast, the children have developed a secure and safe relationship in a nurturing pre-adoptive home where the caseworkers testified that the [C]hildren have developed and are developing a bond with the foster parents and are happy, relaxed, safe, and secure in the current setting where they reside.

N.T., 10/28/2020, at 183-88, 189-90, 191-93, 194-95.

As noted above, the trial court concluded that OCY met its burden of proof that Mother's parental rights should be terminated pursuant to 23

- 6 -

Pa.C.S. § 2511(a)(1), (2), (8) and (b), and that the goals for the Children should be changed to adoption. Thus, following the entry of the orders in this case, Mother filed the appeals now before us and raises the following issues for our review:

> 1.) Whether there is sufficient evidence to support the findings of this [h]onorable [c]ourt that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§] 2511(a)(1) for the involuntary termination of [b]irth [M]other's parental rights?
>
> 2.) Whether there is sufficient evidence to support the findings of this [h]onorable [c]ourt that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§] 2511(a)(2) for the involuntary termination of [b]irth [M]other's parental rights?
>
> 3.) Whether there is sufficient evidence to support the findings of this [h]onorable [c]ourt that the agency proved by clear and convincing evidence the requirements of 23 Pa.C.S. [§] 2511(a)(8) for the involuntary termination of [b]irth [M]other's parental rights?
>
> 4.) Whether this [h]onorable [c]ourt abused its discretion in finding that the developmental, physical and emotional needs and welfare of J.G.K.B. will be best served by the termination of [b]irth Mother's parental rights pursuant to 23 Pa.C.S. § 2511(b), when there is a strong and loving bond between [b]irth Mother and the child, and severance of that bond will cause irreparable harm to the child?

Mother's brief at 4.

We review an order terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient

evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 8 -

or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id.* at 763.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we

review the matter pursuant to section 2511(a)(1) and (b), which provide as

follows:

> **(a) General Rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1)　　The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
>> . . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

Specifically, with regard to section 2511(a)(1):

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition.  *In re C.S.,* [761 A.2d 1197 (Pa. Super. 2000) (emphasis in original)].  The court should consider the entire background of the case and not simply
>
>> mechanically apply the six-month statutory provision. The court must examine the individual circumstances

of each case and consider all explanations offered by the parent facing termination of his … parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.,* … 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied,* … 872 A.2d 1200 ([Pa.] 2005) (citing *In re D.J.S., …* 737 A.2d 283 (Pa. Super. 1999)).

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Additionally, our Supreme Court has held:

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry; (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998).

In her brief, Mother asserts that she met the requirements of her family service plan, that she found housing, went to the Children's appointments, and maintained contact with OCY and underwent a mental health evaluation. Mother also claims she attended suboxone appointments. She further mentioned her difficulty attending appointments for the Children because she is limited to public transportation. Mother also discussed her attendance at visits with the Children, especially in light of the difficulties imposed due to the Covid-19 pandemic. She also claimed her loss of employment was due to the virus because she worked as a waitress in the service industry. However, she notes that she received unemployment benefits and stimulus payments.

Additionally, Mother responds to the claims that she missed hearings, again arguing that she had difficulty with connecting virtually. Mother argues that she never refused or failed to perform parental duties, highlighting the fact she had initiated the Children's placement with OCY due to homelessness, but that the Children appeared well nourished and cared for. *See* Mother's brief at 11-16. Lastly, Mother argues that the Children are bonded with her and that, therefore, her rights should not be terminated. However, she does concede that she needs more services from OCY, requesting an extension "due to the issues brought on and or exacerbated by Covid." *Id.* at 21.

Having reviewed the record, we conclude it supports the findings of the trial court that Mother has refused or failed to perform parental duties. While the trial court recognized that Mother was having a difficult time and that the pandemic amplified her problems, it explained that its decision was "based not on her economic struggles but primarily on the lack of consistency in maintaining a strong, loving, emotionally supportive relationship with the [C]hildren, including weekly or biweekly visits and making sure that she had attended all of those visits." N.T., 10/28/2020, at 190. Additionally, the court noted that these problems had existed prior to the start of the pandemic in March of 2020 and continued to the time of the hearing on October 28, 2020. In fact, the court concluded that more than twenty-four months had elapsed from the time of placement of the Children until the time of the hearing. *Id.* at 193. The court also noted that Mother had not maintained a healthy and

secure parental bond with the Children and her interaction with them was inconsistent and irregular. Rather, the Children "have developed a secure and safe relationship in a nurturing pre-adoptive home where the caseworkers testified that the [C]hildren have developed and are developing a bond with the foster parents and are happy, relaxed, safe and secure in the current setting where they reside." *Id.* at 195.

Accordingly, we conclude that the trial court's findings and conclusion are supported by the evidence presented. Thus, we determine that OCY has carried the burden of proof required under sections 2511(a)(1) and (b), and for that reason, we affirm the trial court's orders.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/7/21